IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

GP W. 3RD AVE., LLC,                         )
                                             )
            Plaintiff,                       )     TC-MD 110081D
                                             )
     v.                                      )
                                             )
LANE COUNTY ASSESSOR,                        )
                                             )
            Defendant.                       )     **DECISION**

Plaintiff appeals the 2010-11 real market value of property identified as Accounts

1189396, 1189370 and 1189388 (subject property.)  David E. Carmichael, Attorney at Law,

appeared on behalf of Plaintiff.  Grace Chang (Chang), Vice President of Grand Pacific; Bill

Newland (Newland), real estate broker employed by Campbell Commercial Real Estate;  and

John H. Brown (Brown), broker and appraiser, testified on behalf of Plaintiff.  David Sohm

(Sohm), Registered Appraiser 3, Lane County Department of Assessment & Taxation, appeared

and testified on behalf of Defendant.

Plaintiff's Exhibit 1, Plaintiff's Rebuttal Exhibit 2, and Defendant's Exhibit A were

received without objection.  Plaintiff's letter dated January 30, 2012, referenced Plaintiff's

Rebuttal Exhibit 1 but that exhibit was not included with Rebuttal Exhibit 2 and was not received

by the court.

## I.  STATEMENT OF FACTS

The subject property is described by Sohm as follows:

"The industrial site [4.57 acres] is situated on the northeast corner of
Wallis Street and West 5th Avenue in Eugene, Oregon. * * *. The site is roughly
rectangular with +/- 444 feet of West 5th Avenue frontage and an average depth
of +/- 390 feet.  There is a westerly extension from the northwest corner +/- 208.7
[feet] to Wallis Street with +/- 125 feet of frontage. The site area is 198,945
square feet or 4.57 acres.  The site is improved with +/- 67,000 square feet of

DECISION  TC-MD 110081D                                                                    1

asphalt paving, +/- 5,800 square feet of concrete paving, and +/- 315 lineal feet of chain link fencing. All city utilities are provided to the subject I-2 zoned property.

"The subject property is improved with an industrial building constructed for high-tech manufacturing use. The building was constructed in 1978 and 1996 and was adapted in 2005 for water bottling use with extensive real property machinery and equipment installed for that use. The concrete tilt-up structure contains a total of 107,708 square feet, including 15,254 square feet of good quality office space on two levels, representing 14% of the building area. The building is average quality construction with 24 foot clear height in 74% of the manufacturing/warehouse area and 16 feet in the westerly 26% of the space. The building is fully fire sprinkled and has heavy electrical service for industrial use. There are 11 grade level loading doors throughout the facility.

"The machinery and equipment included with the building was intended for use by the prior owner for a water bottling operation. A list of the equipment is taken from a June 28, 2007 equipment appraisal by Voorhees Associates and is set forth in the addenda.

"The land to building ratio is 1.85. The site has paved parking and maneuvering areas with landscaped areas support the industrial manufacturing and office use of the property. There is +/- 1,300 lineal feet of chain link fencing. The building provides good utility for industrial use and has a high percentage of office space when compared to other industrial buildings."

(Def's Ex A-2 to -3.; see Ptf's Ex 1-7 to -13.)

The witnesses testified about the ownership history of the subject property. Newland testified that the subject property was purchased in June 2005 for approximately $2 million after having been "shutdown and vacant for three to five years." He testified that the property was sold in July 2005 to Max Langenberg for "2 1/2 times the prior month's selling price." Chang testified that in October 2005, Grand Pacific Financing Corporation was the named lender/beneficiary of a Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing filed by Cascade Title Company, listing Langenburg Research, Inc., and Stanford Square Investors LLC as the borrower/grantor. (Ptf's Ex 1-72 to -75.) The loan between the parties totaled $5,500,000. (*Id*.) Chang testified that in April 2008 the "account became

/ / /

delinquent," a "notice of default was recorded on July 30, 2008, and a "judicial foreclosure was initiated on December 21, 2008." (*See also* Ptf's Ex 1-71, -76 to -80.)

Chang testified that in October 2009 Colliers International prepared for Grand Pacific a Broker Opinion of Value. (*Id*. at -87 to -96.) That report stated three opinions of value for the subject property, labeled conservative, probable, and optimistic, that ranged from $2,900,000 to $4,100,000. (*Id*. at -88.) Chang testified that Grubb & Ellis prepared a property evaluation "without an interior inspection" dated November 17, 2009, concluding an "AS-IS" value of $3,000,000 to $3,500,000. (*Id*. at -101.) In its report, the following was stated in the "Value Conclusion:"

> "The team [h]as been involved in the two most recent sales transactions of this property. We first sold it for $2,100,000, to a company (contractor) that was going to move into it – a HVAC (contractor), then to the current owner for over $5,000,000. The property itself was originally listed for $22,000,000 in 2002, to $6,200,000 in 2003. We were the third brokers listing the property for approximately $5,000,000."

(*Id*.) Newland testified that in 2005 the subject property sold for $2,100,000 after having "been on the market for three years." He testified that the sale to Max Langenberg, the individual referenced as the current owner in the above quoted Value Conclusion, at a selling price of more than $5,000,000, "defies valuation techniques." In Newland's opinion, Langenberg "fell in love with the building and had to have it" regardless of the "price." Brown concurred with Newland's opinion, testifying that the transaction price "didn't make any sense; it was not an arm's length transaction because the principle of substitution and marketing time."

Chang testified that a "sheriff's sale" was initiated in April 2010, and Time Equipment Sales Inc. submitted an "estimated resale value of $725,000 for all machinery and equipment sold within 270 days." Chang testified that Time Equipment Sales, Inc., submitted three options: Option A to purchase all equipment for $256,000; Option B to sell equipment on a " 'SHORT

TERM' individual 'equipment' " item basis for $475,000; and Option C to sell equipment on a " 'LONG TERM individual 'equipment' item basis for $725,000." (*Id*. at -30 to -31.) Chang testified that Grand Pacific did not enter into an agreement with Time Equipment Sales Inc. She testified that Grand Pacific received an estimate from Great American Group for the "auction" value of two equipment items: a "1996 Krones Contiform Blow Molder" and a "2001 Filler Specialties Filler and Capper." (*Id*. at -20.) Neither item was auctioned by Great American Group. Chang testified that Grand Pacific entered into a 90 day "exclusive agreement" with Star Industries to sell the machinery and equipment that it "valued at $1,310,000," but none of the machinery and equipment sold during the 90 days and the contract "terminated." (*Id*. at -81 to -86.)

Chang testified that in January 2011, Grand Pacific offered Campbell Commercial Real Estate an exclusive listing. (*See id*. at -7.) The listing price was $4,800,000 including machinery and equipment and was reduced to $3,500,000 excluding machinery and equipment. (*Id.* at -71.) Plaintiff's requested real market value for subject property including machinery and equipment is $3,500,000 on May 1, 2011. (*Id*. at -71.)

Chang testified that in July 2011, Grand Pacific contracted with Great American Group to "auction off" the machinery and equipment. (*Id*.) She testified that the "auction contract" was cancelled when Eagleflight offered $3,000,000 for the "real estate and equipments." (*Id*.) Chang testified that Grand Pacific's counteroffer of $3,100,000 was accepted by Eagleflight in late July 2011 and a "purchase contract" was "executed" in September 2011. (*Id*. at -48 to -62, -71.) Chang testified that the "purchase contract" was modified on October 25, 2011. (*Id*. at -63 to -68.) Newland testified that he was "deeply involved in the transaction" and that the potential buyer modified the purchase contract because of "environmental concerns." He testified that the

potential buyer canceled the contract because the "levels of contamination were not acceptable to it." Chang testified that the Eagleflight transaction "fell out of escrow" in January 2012.

Newland testified that he entered into conversations with Grand Pacific in April 2010 for "marketing" the property as soon as "foreclosure was completed." He testified that "if Grand Pacific was able to find a user who could utilize the building with its current layout and design," then offering the property for $4,800,000 "seemed more than justified." Newland testified that the subject property was built in "the 1990s" for the manufacture of computer hard drives and that the building's "layout is not usable by vast industrial users in our market." He testified that he "anticipated reducing the offering price significantly to attract more typical industrial users in Eugene area" and the price was "reduced to $3,500,000 on May 20, 2011." Newland testified that given "the functional obsolescence of the subject property" and that the subject property "is a distressed property with a contamination concern," it is likely that if the property sells within the next "six to 12 months" it would be between "$2,000,000 and $3,000,000." Newland testified that the court should give "fair amount of weight to the $3,100,000, the last sale price of six years ago," because it is a "pretty good indicator of an arm's length transaction." Brown testified that "it still would be a challenge to achieve $3,000,000" because the subject property has "too many challenges because of its "limited utility," "age," "unusual design" and features, including raised "false floor grates, limited ground floor height, and load bearing supports would make it a challenge to renovate." Brown testified that the subject property's listing sets the "upper limit" for the subject property's real market value. Brown testified that his "opinion of value" as of the assessment date is $3,000,000 to $3,700,000 including machinery and equipment.

Brown, who stated that he was testifying as a "broker today" even though he is a licensed

appraiser, testified that he worked with the subject property owner's during their 2008-09 property tax appeal. Brown and Sohm agree that for the 2008-09 tax year the parties agreed that the real market value of the machinery and equipment ($4,131,423) was "based on the orderly liquidation value from the [Voorhees] appraisal with adjustments" as of June 28, 2007. (Def's Ex A-18.) He testified that the "equipment was imported from Europe and did not meet U.S. standards." The parties discussed the definition of "orderly liquidation" and "auction value." Brown testified that in his opinion the value of the machinery and equipment has dropped "32 to 35 percent" and an orderly liquidation was would result in "30 cents on the dollar, or $1,395,816," and an auction would result in "22.5 cents on the dollar, or $1,046,862." Sohm testified that the subject property owner did not "file returns" and the last machinery and equipment information the county received was the "Loeb and Voorhees appraisal." In rebuttal, Plaintiff submitted a copy of the Loeb Equipment & Appraisal Company Appraisal Report, stating that it was prepared for the purpose of public auction and forced liquidation value as of October 16, 2008. (Ptf's Rebuttal Ex 2.) The parties discussed the report's stated public auction value of $975,600. (*Id*. at -5.) Sohm questioned whether all the assets stated in either the Loeb or Voorhees reports were on the subject property as of January 1, 2010.

Sohm testified that his appraisal report "done for January 1, 2010," concludes that the subject property including machinery and equipment had an indicated real market value of $8,373,000. (Def's Ex A-1.) He testified that the highest and best use of the subject property is "a large owner occupant type of industrial manufacturing building at January 1, 2010." (*Id*. at -3.)

Sohm testified that he briefly described five "industrial sales" he identified as comparable to the subject property. (*Id*. at -11.) He testified that those sales closed between January 2008

and September 2010, but there were not enough sales to make "quantitative adjustments" and he relied on "qualitative adjustments." (*See Id.*) Sohm testified that he placed "the most reliance" on two sales: comparable sale 3, a "concrete tilt-up building" located across the street from the subject property that sold in March 2010, for $45.37 per square foot and comparable sale 5, a "metal industrial building with 20 foot wall height constructed for a trailer manufacturing company in 1985" that sold in March 2010, for $45.40 per square foot. (*Id.* at 11, 12.) Sohm testified that "[o]verall, a price per square foot of $45 is selected for use in this analysis. Applying $45 per square foot to the 107,708 square feet in the subject building results in a value indication of $4,846,860, rounded to $4,847,000." (*Id.* at -12.)

In response to questions, Sohm testified that he did not inspect the subject property and that he made interior inspections of all comparable properties except comparable 5. Sohm testified that he made no time adjustments even though three of the sales were after the assessment date and one sale was 20 months prior to the assessment date. He explained that any "downward" time adjustment for the sale closing 20 months prior to the assessment date would be "offset by the nature of the building and lack of office space." Sohm was questioned about the size of the two comparables he determined were most like the subject property even though those buildings were less than one-half the size of the subject property. Brown testified that in selecting comparable properties to the subject property he looks for "sales that are comparable accurate indicators of value" and the subject property is a "challenging property." Brown testified that he would have "put more weight on the Pepsi bottling property" because it was a "better size comparison" and "sale was close in date" to the assessment date. He testified that he did not know how Sohm could determine which comparable properties were superior or inferior to the subject property when Sohm testified that he had not made an interior inspection of the

subject property. Brown testified that the subject property has "functional obsolescence" and an adjustment should have been made. Newland testified that Sohm's comparable sales are not comparable to the subject property because "there are no comps out there; the subject property is a "complete anomaly" that is "functionally obsolete and not applicable to industrial market and a lot of office space."

Sohm testified that in considering the income approach he concluded that it was "difficult to find good lease comparables." In his report, Sohm wrote:

> "The subject property is a 94,050 square foot owner occupied industrial building with warehouse and office space, including 14.5% finished office. There is no income history from leasing of the subject property. Comparable large industrial properties are typically owner occupied and seldom leased on an [arm's-]length basis."

(*Id*. at -13.) Sohm selected five lease comparables, ranging in "rent per square foot" from 24 cents to 45 cents, triple net. (*Id*.) Sohm concluded that "[a]fter considering the available lease data in the subject's market area, it is estimated that the appropriate lease rate on a triple net basis is $0.34 per square foot. This indicates monthly rent of $36,621 and annual potential gross income of $439,452." (*Id*. at -14.) Brown testified that the lease rents selected by Sohm do not consider the functional obsolescence of the subject property and he was aware of a "large facility" that recently leased for 21 cents per square foot.

Sohm testified that a "vacancy factor of 10% of gross income is projected as a vacancy allowance for the subject property in recognition of the size and current market conditions." (*Id*. at -16) He determined that

> "[t]he operating expenses for the subject property under a typical triple net lease would involve management and reserves for replacement. An allocation of 3% of effective gross income is judged to be appropriate for management, resulting in an expense of $11,865 per year. An allocation of 2% is appropriate to reserves for replacement of short lived items in this building, amounting to $7,910 per year. Total expenses are estimated to be $19,775, on a triple net basis."

(Def's Ex A-16.) Sohm testified that the "projected net operating income before property taxes for the subject property is $375,732." (*Id*.)

Sohm referenced his five comparable sales and noted that the overall capitalization rates "rang[ed] from 5.48% to 9.29%." He testified that the "wide range is due to the inconsistency between current rental rates and sales prices for owner occupied large properties" and explained that conclusion by referencing comparable sales 3 and 5. (*Id*. at -16 to -17.) Sohm testified that he concluded an overall capitalization rate of eight percent. (*Id*. at 17.) Brown testified that Sohm's capitalization rate does not reflect the "risks associated with a single tenant" and the "prolonged exposure of the subject property to the market."

Sohm testified that "[a]pplying the overall capitalization rate to the net income" results in an "indicated market value" of $4,697,000. (*Id*.)

In response to questions, Sohm testified that he did not inspect any of those properties except comparable 5. Sohm testified that none of the lease comparables are "ideal," but "none exists." He testified that "any large building lease is helpful," but he would have preferred to use "leases within date of value, if he had them." Brown testified that some of Sohm's leases "are old, dating back to late 2006." Brown testified that some of the properties Sohm selected as comparable to the subject property are "vastly superior to the subject property." Brown testified that in his opinion a "34 cent triple net lease rate is not achievable then or now." Newland testified that "maybe a portion" of the subject property's building could rent for 34 cents per square foot.

Sohm testified the "value indicated by the income approach supports the sales comparison analysis and is considered reasonable." (*Id*.) He testified that because "[o]ne of the sales is particularly comparable to the subject in terms of effective age, quality, and office

percentage," the "sales comparison approach is given considerable credence in the final analysis." (*Id*.) Sohm testified that he concluded "a real market value as of January 1, 2010 of *$4,800,000*." (*Id*.)

Sohm testified that he is not a machinery and equipment appraiser and he relied on "a prior Magistrate settlement for the 2008 year" concluding "the value of the machinery and equipment" to be "$4,131,423 based on the orderly liquidation value from the [Voorhees] appraisal with adjustments." (*Id*. at -18.) He explained that he applied "the depreciation and trend schedule from the Department of Revenue of .93 for 2009[] and 0.93 for 2010" to the 2008-09 real market value to determine "a value for January 1, 2010" of $3,573,000 (rounded). (*Id*.) Sohm explained that the Loeb Equipment and Appraisal Company appraisal "was not deemed to be reliable" when determining the 2008-09 machinery and equipment value because "the equipment remains in the building and could be sold in an orderly liquidation" rather than the "forced liquidation" that was the basis of the Loeb appraisal. (*Id*.)

Sohm testified that the "total property value for assessment purposes [is] the combination of the value of the real estate (land and structures) plus the contributory value of the real property machinery and equipment. * * *. The total value of the real property is estimated to be $8,373,000." (*Id*.) In response to questions, Sohm testified that "the county is looking at real market value" that reflects "stabilized occupancy," "not fire sale" or "bank owned foreclosure sale prices."

## II. ANALYSIS

The issue before the court is the 2010-11 real market value of Plaintiff's property. Real market value is the standard used throughout the ad valorem statutes except for special assessments. *Richardson v. Clackamas County Assessor*, TC-MD No 020869D, WL 21263620,

at *2 (Mar 26, 2003) (citing *Gangle v. Dept. of Rev.*, 13 OTR 343, 345 (1995)). Real market value is defined in ORS 308.205(1),[1] which reads:

> "Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."

There are three approaches to valuation (cost, income, and comparable sales) that must be considered in determining the real market value of a property even if one of the approaches is found to not be applicable. OAR 150-308.205-(A)(2); *see* ORS 308.205(2). Plaintiff did not submit an appraisal using any of the three valuation approaches. Defendant submitted an appraisal report, using both the comparable sales approach and income approach to determine the subject property's real market value.

As the party seeking affirmative relief, Plaintiff bears the burden of proving that the subject property's real market value is incorrect on the tax roll. ORS 305.427. Plaintiff must establish its claim "by a preponderance of the evidence, or the more convincing or greater weight of evidence." *Schaefer v. Dept. of Rev.*, TC No 4530 at 4, WL 914208 (July 12, 2001) (citing *Feves v. Dept. of Rev.*, 4 OTR 302 (1971)).

Plaintiff must present the greater weight of evidence to support its requested real market value reduction. This court has stated that "it is not enough for a taxpayer to criticize a county's position. Taxpayers must provide competent evidence of the [real market value] of their property." *Poddar v. Dept. of Rev.*, 18 OTR 324, 332 (2005) (quoting *Woods v. Dept. of Rev.*, 16 OTR 56, 59 (2002). Competent evidence includes appraisal reports and sales adjusted for time, location, size, quality, and other distinguishing differences, and testimony from licensed professionals such as appraisers, real estate agents and licensed brokers.

---

[1] References to the Oregon Revised Statutes (ORS) are to year 2009.

Plaintiff failed to use any of the three common approaches prescribed by statute to determine the subject property's real market value. Plaintiff relied solely on the testimony of two experienced brokers. Newland listed the subject property for sale in January 2011, 12 months after the assessment date, for a listing price of $4,800,000 including machinery and equipment. Newland testified that because the listing price was reduced in May 2011 to $3,500,000 excluding machinery and equipment he now concludes that the subject property's real market value is "between $2,000,000 and $3,000,000." (Ptf's Ex 1-71.) Brown testified that his "opinion of value" as of the assessment date is $3,000,000 to $3,700,000 including machinery and equipment." The brokers offered the court a range of real market value ($2,000,000 to $4,800,000) for the subject property's real market value including machinery and equipment without reconciliation.

Even though Plaintiff's broker witnesses are experienced, the court was not provided with any specific data supporting their range of real market values. The court must determine the subject property's real market value as directed in ORS 308.205(1), looking at arm's length transactions. The court does not know if each individual relied on specific market data based on arm's length transactions between a willing buyer and willing seller, or if each broker's suggested real market value was a value based on a foreclosure or "fire" sale.

Plaintiff submitted two broker's opinions of value for the subject property, dated October 2009 and November 2009. (Ptf's Ex 1-87 to -102.) Those reports concluded a range of value from $2,900,000 to $4,100,000. (*Id*. at -88.) The authors of those reports did not testify. One report stated the "[p]roperty has NOT been inspected inside" and "[i]t is our best estimate that the above pricing would expedite a sale." (*Id*. at 101.) Without testimony from those who

/ / /

prepared the reports, the court finds that information unpersuasive in determining the subject property's real market value.

Plaintiff submitted no evidence of the subject property's machinery and equipment real market value as of the assessment date. Defendant submitted a copy of an appraisal report dated June 28, 2007, for the machinery and equipment. (Def's Ex A-20 to -69.) According to the report at that date, two and one half years prior to the assessment date, the values ranged from $8.5 Million to $3.3 Million (rounded). Sohm testified that Plaintiff and Defendant agreed to a value of $4,131,423 as of January 1, 2008. Plaintiff did not submit a list of machinery and equipment owned by it as of the assessment date. Plaintiff's two brokers testified that their estimates of real market value included the machinery and equipment without stating how much of the real market value, if any, should be allocated to the machinery and equipment. One of the brokers' opinions of value stated that "no value is given to this equipment." (Ptf's Ex 1-88.) Plaintiff submitted no evidence of the machinery and equipment's real market value as of the date of assessment for the court to consider.

Plaintiff's evidence in support of its requested real market value reduction is inconclusive. When the "evidence is inconclusive or unpersuasive, the taxpayer will have failed to meet his burden of proof ***." *Reed v. Dept. of Rev.*, 310 Or 260, 265, 798 P2d 235 (1990). Plaintiff has failed to carry his burden of proof.

Even though the burden has not shifted, "the court has jurisdiction to determine the real market value or correct valuation on the basis of the evidence before the court." ORS 305.412. Sohm prepared an appraisal report using both the comparable sales approach and income approach. The appraisal experts agree that there are few, if any, comparable properties in the Eugene area that have sold. Using the comparable sales approach, Sohm determined a "price per

square foot of $45" based on "qualitative comparisons." (Def's Ex A-12.) That value ($45 per square foot) is at the high end of the comparable sales range for buildings with substantially less available square footage than the subject property. (*Id*. at -11.) Sohm stated that his report was based on "qualitative comparisons," even though he testified that he did not inspect the subject property. The court does not know how Sohm made well reasoned qualitative comparisons when he never inspected the subject property. Given the challenging characteristics of the subject property and the evidence, the court concludes that a more reasonable price per square foot is $35 and determines an indicated real market value of $3,700,000 (rounded).

Using the income approach, Sohm determined an indicated real market value of $4,697,000. (*Id*. at -17.) Sohm determined the subject property's gross revenue using 34 cents per square foot, stating the subject property has "no income history from leasing" because it was owner-occupied. (*Id*. at -13.) Sohm did not include the dates the tenants entered the leases and most of the leases were for substantially smaller facilities than the subject property. Even though the capitalization rates ranged from 5.48 percent to 9.29 percent with three of the five sale comparables showing rates of nine percent, Sohm selected an eight percent capitalization rate with no adjustment for property taxes. (*Id*. at -11, -16 to -17.) Based on the stated concerns, the court places little weight on Sohm's indicated real market value using the income approach.

After placing the most weight on the comparable sales approach because the subject property has no leasing history and the capitalization rate did not include a property tax rate, the court reconciles the two approaches to determine a real market value of $3,700,000.

Sohm determined the subject property's machinery and equipment real market value starting with the 2008-09 tax year and applying the Oregon Department of Revenue "depreciation and trend schedule." (*Id*. at -18.) Sohm admitted that he is not a machinery and

equipment appraiser and because Plaintiff failed to file property tax returns he, like the court, does not know what items of machinery and equipment were present on the assessment date. Because Plaintiff failed to submit any evidence separating the real market value of the building from the machinery and equipment, the court accepts Defendant's determination that the subject property's machinery and equipment real market value is $3,573,000 as of January 1, 2010.

### III. CONCLUSION

After careful review of the testimony and evidence, the court concludes the Plaintiff failed to carry its burden of proof. After careful consideration of Defendant's appraisal report, the court concludes that the subject property's 2010-11 real market value is $7,273,000. Now, therefore,

IT IS THE DECISION OF THIS COURT that the real market value of property identified as Accounts 1189396, 1189370 and 1189388 as of January 1, 2010, is $7,237,000.

Dated this ____ day of April 2012.

 

 

JILL A. TANNER
PRESIDING MAGISTRATE

*If you want to appeal this Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by mailing to: 1163 State Street, Salem, OR 97301-2563; or by hand delivery to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your Complaint must be submitted within 60 days after the date of the Decision or this Decision becomes final and cannot be changed.*

*This document was signed by Presiding Magistrate Jill A. Tanner on April 2, 2012. The Court filed and entered this document on April 2, 2012.*